IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES ) | |
| ) | |
| v. ) | Case No. cr- 05-316 (ESH) |
| ) | |
| PABLO RAYO MONTANO et al. ) | |

GIGLIO RESPONSE AND NOTICE OF EXPERT TESTIMONY

Comes the United States through Kenneth A. Blanco, Chief, Narcotic and Drug Dangerous Drug Section, and Paul W. Laymon, Donnell Turner, and Mary Mogavero, Trial Attorneys, with the Narcotic and Dangerous Drug Section, Department of Justice, and herein provides notice of impeachment material and notice of expert testimony.

Impeachment Material

The United States has provided the plea agreements for the following defendants to defense counsel: Fidel Sandoval (Miami indictment), Fidel Sandoval (DC indictment), Jackson Orozco Gil (DC indictment), Jackson Orozco Gil (Miami indictment), Victor Hugo Serna (DC and Miami indictments), Hector Aguilar (DC indictment), Jose Eduardo Arango (DC and Miami indictments), Sandra Orozco Gil (Miami indictment), Ruben Menaca, Yohibel Jose Dunn Aguilera, Mars Micolta Hurtado, Deguis Romero Acosta, Domingo Micolta Hurtado, Eyder Xiomara Bejarno Olaya, Jhon Jair Moreno Betancourt, Ramon Esturgio Matamba Portocarrero, Victor Fidel Torres Torres, and Monica Patricia Ruiz Matorel.

The government has reviewed the personnel files of the agents and officers it intends to

call as witnesses. This review was to determine if any potential impeachment materials existed in those personnel files. At this time, the government has not found or identified any information which would be a proper matter for cross examination of any agent or officer. However, in several instances, there were archived files which could not be readily examined for potential impeachment materials. If a later review of such archived files reveals any information which would be proper for cross examination, such information will be disclosed.

Jackson Orozco Gil has a prior felony drug conviction from New York. He was convicted and sentenced under a name other than Jackson Orozco Gil. He served approximately six years in the Bureau of Prisons and was released in 1996. Fidel Sandoval has a prior felony drug conviction from Texas in the 1980's. Both cases involved cocaine and both defendants were deported after being released from the Bureau of Prisons.

The government will file a motion under seal objecting to the disclosure of the names of the remaining witnesses which might be called to testify at a trial in this matter. However, impeachment materials exist concerning three of these witnesses. The first witness, who will simply be referred to as witness number 1, lived in a country other than the US but has been relocated, with the assistance of the Drug Enforcement Administration, to the United States. This witness provided extensive information about targets who are now defendants in either the DC or Miami indictments. The witness was in considerable danger because of the assistance provided by the witness, so the DEA assisted the witness and several close family members in moving to the US. The DEA arranged for the witness and the family members to receive entry to the US, and paid for transportation and moving expenses of the witness and the family members. The witness received payments from the DEA for services provided in the course of the investigation. In addition, the DEA recommended that the witness receive a significant cash

award as is provided for in Title 22, United States Code, Section 2708. The statute provides that the Secretary of State may authorize an award not in excess of 25 million dollars to assist in the prevention of international drug trafficking. The award recommendation was reviewed by a committee created under authority of Section 2708, and after review of the DEA recommendation, the committee recommended that the amount of the potential award be increased. The award has not been approved and is still being reviewed by the Department of Justice, as is required by the statute. Up to this date, this potential witness has been paid at least $225,000 as reimbursement for expenses, payment for relocation expenses, and payment for information provided.

The second witness, who will be referred to as witness number 2, was closely connected to Pablo Rayo. The witness presently lives in a country other than the US and has been paid by the DEA for assistance provided in the case. Those payments included reimbursement for expenses to travel to interviews, for missed work, and for services provided. The total amount of money paid to this witness was less than $15,000.

The third witness has been indicted in the US for trafficking cocaine, is in custody, and has pled guilty to a cocaine trafficking offense. This witness was not indicted in the Rayo case.

<u>Expert Testimony</u>

The government may call the following witnesses to give expert testimony: Terry Jentsch, Patrick Flood, Arthur Ventura, Lee Nash, Amanda Davis, Michael Garland, James McGovern, Javier Ballesteros, Patricio Cantenado, Michael Johnson, and Fernando Carillo Garcia.

All of the above potential witnesses are either currently serving as DEA agents or have retired from the DEA, with the exception of Patricio, who served formerly as a drug prosecutor in the Republic of Panama and is now employed by the US as a foreign service national, and Carrillo Garcia who is a police officer in Guatemala.

Terry Jentsch is presently serving as a DEA agent. He has been with the DEA for more than ten years. He served for six years with the DEA in Cartagena, Colombia, ending his service there in 2007. He is currently assigned to the southwest border region in Texas. He completed the DEA's six month Spanish language course here in DC and after serving for several years in Colombia is relatively fluent in Spanish. The focus of his work in Colombia was in identifying Colombian cocaine traffickers and attempting to interdict shipments of cocaine bound from South America to the United States. He worked extensively with the national police in Colombia and assisted them in their judicially authorized telephone intercepts. He has participated in many investigations of Colombian cocaine traffickers. He is knowledgeable about how cocaine is grown, how it is manufactured, how it is packaged, how and by routes it is transported to the US, how much it costs in Colombia, how Colombian trafficking groups are organized, how Colombian traffickers get their drug proceeds back to the US, and how those proceeds are laundered in Colombia. His testimony will include those areas.

Patrick Flood has been with the DEA for 17 years. From 1991 to 2001, he served with the DEA in New Jersey, from 2001 until July 2007 he served with the DEA in Sao Paulo, Brazil, and since July 2007 he has been in the DEA office in Dayton, Ohio. In 1994 he served for three months in Bolivia, and in preparation for that in 1993 he attended six months of Spanish language instruction. In 2000 he attended six months of Portuguese language training. He is relatively fluent in Portuguese. He worked in Sao Paulo to identify Colombian drug traffickers

who moved to Sao Paulo and Brazil, and worked extensively with the national police in judicially authorized telephone intercepts. He has participated in many investigations of cocaine trafficking in Brazil, specifically with traffickers connected to the US. He is knowledgeable about the prevalence of Colombian traffickers moving to Brazil and why that is happening. He can also discuss common money laundering schemes used by Colombian drug traffickers in Brazil. He will testify that it is becoming common for Colombian drug traffickers to move to Brazil. He will testify that with the advent of modern communications devices, a Colombian drug trafficker living in Brazil can still direct the distribution of cocaine worldwide, or in particular to the US. He will talk about the role of couriers in bringing money and documents from Colombia to drug traffickers in Brazil. He will testify about the way Colombian drug traffickers can launder their drug proceeds in Brazil.

      Arthur Ventura served with the DEA for more than 20 years and has recently retired from the DEA. He served for seven years in Panama, and was in the Panama DEA office for most of the investigation involving Pablo Rayo. In fact, he was the lead agent in Panama for the Rayo investigation. He is fluent in Spanish and worked extensively with his counterparts and with Panamanian prosecutors in identifying cocaine traffickers using Panama as a transhipment point or in ferreting out Colombian drug traffickers who operated out of Panama. Retired SA Ventura received special training and experience in money laundering. Lee Nash is a DEA agent who formerly served in the 959 DEA group in Chantilly, Virginia. In that role he investigated cocaine trafficking cases in Central and South America. He has most recently been assigned to the resident DEA office in Panama and has been in Panama for more than 18 months. Similarly, Amanda Davis is a DEA agent presently serving in Panama with Lee Nash. Both Nash and Davis have attended the six month DEA Spanish language course and are both

relatively fluent in Spanish. Like Ventura, Nash and Davis have focused their investigative efforts on identifying Colombian and Panamanian traffickers who are using Panama to ship cocaine to the US. Ventura, or if he is not available then Nash or Davis, will testify that Panama plays an important role as both a transhipment point for Colombian cocaine bound for the US and as a safe haven for Colombian drug traffickers looking to escape the glare of Colombia. He will testify that Panama has a thriving economy with a sound banking system and investment opportunities which attract Colombian drug dealers with drug proceeds to launder. He will testify that large shipments of cocaine which come in or near Panama are bound for the US. He will testify that once the cocaine is distributed and sold in the US, the drug proceeds in US dollars frequently go back to Colombia through Mexico and Panama, but can be laundered in Panama. He would also testify to the price of cocaine in Panama and how a Colombian trafficker makes money by selling his product to Mexican transporters (who sell it in the US). Patricio is a former long time prosecutor in the Panama equivalent of the Department of Justice. He left the prosecutor's office and is now employed by the US in Panama as a foreign service national. He serves as a liaison between personnel in the US Embassy and DEA and the Panamanian prosecutors. He is a native of Panama. He has a great deal of experience in investigating and prosecuting cocaine traffickers in Panama. He would testify in a like manner as set out above.

      James McGovern and Javier Ballesteros are DEA agents assigned to Miami, Florida. McGovern has served with the DEA for more than 10 years while Ballesteros has served with the DEA for approximately ten years. Both have investigated many cocaine trafficking cases in Miami, particularly of Colombian traffickers smuggling cocaine to the US. They have extensive experience with judicially authorized telephone intercepts. They will testify as to how cocaine

gets to the US, that is, the mode of smuggling and the prices for cocaine in the US. They can testify as to how, in what quantity, and in what amounts cocaine is sold at the wholesale and retail levels, that is, how much cocaine costs the various levels of dealers who acquire the cocaine and how much it costs on the street. They can testify as to how cocaine is ingested by a typical user and what amount a typical user might use. They can testify to how drug proceeds in US dollars are smuggled out of the US and back to Central and South America.

Michael Garland is a retired DEA supervisory special agent. He retired after almost 30 years of service with the DEA, having served in several positions in Central America, primarily in Mexico. Since his retirement he has continued to work on a contract basis for the DEA. Garland can testify to the modus operandi of drug trafficking organizations in Central and South America. He can testify, similar to some of the witnesses set out above, as to where cocaine is grown, how it is processed into cocaine, how it is packed and transported, what are the most common routes and modes of trafficking, the cost of cocaine as it leaves Colombia, and travels through Panama, Guatemala, and Mexico, how cocaine is distributed in the US, how and why the cocaine business is a lucrative business for all in the chain of distribution. He can testify that large shipments of cocaine going through Panama, Guatemala, and Mexico are bound for the US. He can describe how drug traffickers secrete their drug proceeds for transportation back south and how drug proceeds are laundered.

Michael Johnson has been with DEA for more than 14 years. He graduated from the University of Colorado then joined the DEA, serving first in the office in Denver. He completed the Spanish language school and from 2001 to June 2007 served in Guatemala. Since June 2007 he has served in San Juan, Puerto Rico. In his six years in Guatemala he assisted agents from the US with cases in Guatemala and served as a liaison to Guatemalan law enforcement. He

developed and interviewed informants, and investigated many cocaine trafficking cases. Carrillo Garcia is a police officer with Guatemala's federal drug investigation agency, SAIA. He has served as a narcotics officer at the ports in Guatemala, as a narcotics investigator, as chief of the intelligence analysis section in SAIA, and is presently on loan to the new customs enforcement agency created in Guatemala. He has served as a police officer in Guatemala for 17 years. Johnson will testify about the production, processing, distribution, and transportation of cocaine from South America to the US. He will testify about how cocaine is grown and will describe the process by which cocaine is made. He will testify about the role of Guatemala as a transshipment point for cocaine going from Colombia to the US, in particular he will testify about the connections between Colombian traffickers, Guatemalan middlemen, and Mexican transporters. He will testify about why Colombian drug traffickers prefer to send cocaine through Guatemala. He will also testify about the prices of cocaine in Colombia and Guatemala versus prices in the US. He will testify that there is no real domestic market in Guatemala for cocaine and that large shipments of cocaine coming through Guatemala are going to the US. Carrillo Garcia's testimony would be similar to and overlap the testimony of Johnson. He would testify that Guatemala is a poor nation, with inadequate law enforcement resources and no significant domestic market for cocaine. In his experience, he would testify that large shipments of cocaine coming to Guatemala are going on the US. He would testify that the border with Mexico is vast and is difficult to control for many reasons, including lack of police, difficult terrain, and that much of the border is controlled by bandits or drug cartels. Both Johnson and Garcia can testify about how cocaine is ingested.

What these witnesses can provide, either singly or when taken together, is the following: the coca plant is grown in Colombia and in other South American countries. Once

harvested, the useable portions of the plant are taken to labs for processing into cocaine. The cocaine is usually compressed into bricks and packaged for transportation, and the bricks often contain the distinctive logo of the group moving it. The cocaine can be moved via air, land, or sea, and either sent directly to the US or sent via countries like Panama, Guatemala, and /or Mexico. Large shipments of cocaine headed north from Colombia are almost always headed to the US. Cocaine headed to Europe rarely transits Panama, Guatemala, or Mexico. Cocaine can be purchased very cheaply in Colombia, but as it moves north to the US the price of the cocaine goes up because of the expense of transportation, the increased dangers from law enforcement and rival dealers, and greed. Because Mexico and the US have been more vigilant about intercepting shipments of cocaine, many traffickers send their cocaine overland or via ship or air to Panama or Guatemala, as opposed to sending it directly to Mexico or the US. From Panama or Guatemala, the cocaine can be safely moved to Mexico and on to the US, crossing the border of Mexico and the US in trains, trucks, and couriers of all kinds. Once in the US the cocaine can be sold for more than $20,000 per kg, which is much more than the several hundred dollars it cost to acquire in Colombia. Drug traffickers like Rayo can move hundreds of kgs or thousands of kgs of cocaine at a time to the US and make a great deal of money. The money is smuggled out of the US through Mexico, or Guatemala, or Panama, and eventually gets back to the dealer. Money can be laundered in Guatemala or Panama in a variety of ways, often by putting the drug money in what appears to be legitimate businesses. One common way to launder drug proceeds is to set up a company which appears to sell legitimate products, such as fish or boating equipment, for example. Fake invoices are created to show that inventory exists and has been legitimately sold, whereas the actual money being deposited into the business account is not money from legitimate sales but drug proceeds.

Another way to summarize the testimony of the above witnesses is to say that each witness may testify to (1) the manner of distribution of Colombian cocaine, (2) the exportation of Colombian cocaine to the US, (3) the composition of drug trafficking organizations, and the different roles people play in that organization, (4) the processing and packaging of cocaine, (5) the cost of the cocaine, (7) the terminology used in drug trafficking, (8) the purchase of cocaine by the end user, what is a typical user amount, how much it costs, and how it is ingested, (9) the methodology of cocaine investigations, including the use of telephone intercepts and confidential sources, (10) and the procedures used by law enforcement.

Fed. R. Crim P. 16(a)(1)(G) provides that the summary of expert testimony must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. With regard to their qualifications, each of these witnesses has been involved in law enforcement for varying amounts of time, but in most instances for a substantial period of time, some for longer than 20 or 30 years. Each witness called will give testimony pertinent to the country in which the witness served. Though there is most certainly some overlap between some witnesses, each country is uniquely connected to Colombian cocaine trafficking, and the witness from that country can provide that testimony. Each witness is able to testify and reach certain conclusions based on their unique experience in the country in which they served. Each witness is able to testify and offer opinions based primarily on the length of service in their particular country, but also on their general service and educational background. Further, each witness will offer opinion testimony. For example, in the case of the specified witnesses from Colombia, Panama and Guatemala, but also including retired SA Garland, the witness will offer the opinion that large shipments of Colombian cocaine going through those countries is headed for the US.

                                                                                                                   \_\_-S-_____
Paul W. Laymon
Trial Attorney
Narcotic and Dangerous Drugs
Department of Justice
1400 New York Avenue NW
Washington, DC 20005
202-514-1286 (work)
202-725-7741 (cell)
202-514-0483 (fax)
Email paul.laymon@usdoj.gov

Certification of Service

On May 1, 2008, a copy of this notice was emailed to defense counsel, Eduardo Balarezo and Elita Amato.

\_-s-_____
Paul Laymon