UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| JAIME MICOLTA HURTADO, ) | Criminal No. 05-316 (ESH) |
| JUAN CARLOS GOMEZ, ) | |
| ) | |
| Defendants. ) | |

**GOVERNMENT'S MOTION IN LIMINE SEEKING ADMISSION OF TELEPHONE
CALLS OCCURRING IN FURTHERANCE OF THE CHARGED CONSPIRACY**

The United States, by and through the undersigned attorneys, respectfully moves this Court to admit evidence of six telephone calls which occurred in furtherance of the conspiracy, including three telephone calls that occurred within the time-frame of the charged drug conspiracy and three telephone phone calls that occurred outside the time-frame of the charged drug conspiracy. This evidence is being offered by the government pursuant to Federal Rule of Evidence 801(d)(2)(E), as such evidence consists of co-conspirators statements made during and in furtherance of the conspiracy. These statements constitute direct evidence to prove the existence and nature of the conspiracy, the relationships between the defendants and other individuals involved in the conspiracy, and each individual's roles in the conspiracy. In addition, they complete the story of the charged conspiracy. In support of its motion, the government relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this matter:

Factual Background

On February 22, 2006, the defendants were charged in a superseding indictment with Conspiracy to Import Five Kilograms or More of Cocaine into the United States and Conspiracy to Manufacture and Distribute Five Kilograms or More of Cocaine Intending and Knowing that the

Cocaine Would be Imported Into the United States. The charged drug conspiracy, which was ongoing in nature, covers the period from January 1990 through February 22, 2006. This charge involves the smuggling of numerous shipments of cocaine transported by the defendants or their co-conspirators from Colombia, through various transshipment points in Central America, ultimately destined for the United States, as well as money laundering activities utilized by conspirators to conceal the drug proceeds. Although the charged conspiracy ends on February 22, 2006, the conspiracy was ongoing and continued up until the time of the defendants' and other conspirators' arrests on May 16, 2006.

The Government seeks to admit evidence of six telephone conversations involving the defendants and/or their co-conspirators, three of which take place during the period of the conspiracy and three of which take place outside the period of the charged conspiracy, as alleged in the superseding indictment. With respect to the three telephone calls that occur within the period of the charged conspiracy, one phone call occurs between co-conspirator Pablo Rayo and defendant Jaime Micolta on June 23, 2005 ("Rayo-Micolta 2005 call"). The other two phone calls occur between Rayo and defendant Juan Carlos Gomez - one on February 7, 2006 and the other on February 11, 2006 (referred to by the date of the call). All three of these calls will be described in further detail below.

In a phone call, which also occurs on April 20, 2006 but at 9:59 p.m. ("Rayo-Micolta 2006 call"), Rayo then contacts defendant Jaime Micolta using the same number provided to Rayo by Sandoval just several hours before in the Pablo-Fidel call. In the Rayo-Micolta 2006 call, defendant Micolta informs Rayo that he was working at a factory with Mexicans in California and that he had an alternate route to bring cocaine up from Mexico that was safe and did not involve "rivers [or]

2

containers. . . . I mean, my friends who work with me, they live in Tijuana. They go over there every single weekend." In addition, Micolta and Rayo discuss problems that had occurred in Panama with another co-conspirator, Alberto Torres (referred to in the phone call as "Pedalio"), because Torres apparently had made too many trips to Guatemala. According to the government's evidence, Torres and defendant Micolta were responsible for shipping tons of Colombian cocaine from Panama to Guatemala and eventually to the United States.

In the phone call, which occurs on April 25, 2006 ("Rayo-Jackson call"), Rayo and co-conspirator Jackson Orozco-Gil, discuss, among other things, defendant Micolta's alternate proposal to smuggle cocaine from Mexico into the United States. In addition, Rayo informs Gil that he had recently spoken to co-conspirator Fidel Sandoval (the Pablo-Fidel call) and questioned whether Sandoval was properly following instructions with regard to their attempts to launder drug proceeds.

## Discussion

The government submits that the foregoing telephone calls are admissible as co-conspirator's statements under Federal Rule of Evidence 801(d)(2)(E), as such statements occurred during and in furtherance of the conspiracy, notwithstanding the fact that the statements occurred outside the time-frame of the charged conspiracy in the superseding indictment. "Fed.R.Evid. 801(d)(2)(E) embodies the longstanding doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are not hearsay and are admissible against the others, if made in furtherance of the common goal." United States v. Perholtz, 842 F.2d 343, 356 (D.C. Cir. 1988) (citing United States v. Weisz, 718 F.2d 413, 433 (D.C. Cir. 1983), cert. denied, 465 U.S. 1027 (1984)). Furthermore, the law in this Circuit is clear that "[t]he statements of joint venturers may fall within this rule, and there is no requirement that a conspiracy be formally charged in the

indictment." Id. (citing Fed.R.Evid. 801 Senate Judiciary Committee notes and United States v. Jackson, 627 F.2d 1198, 1216 (D.C. Cir. 1980)). Consistent with this view is United States v. Gewin, 471 F.3d 197 (D.C. Cir. 2006), in which the Court of Appeals explained:

> Although Rule 801(d)(2)(E) refers to "conspiracy" and "coconspirators" . . . our precedents hold that the doctrine is not limited to unlawful combinations. Rather, the rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials, "embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are . . . admissible against the others, if made in furtherance of the common goal." In support we quoted the 1974 Senate Advisory Committee note to Rule 801(d)(2)(E), which said that the rule was "meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purpose of this [R]ule even though no conspiracy has been charged.

Id. at 201 (internal citations omitted, emphasis added) (citing Weisz, 718 F.2d. at 433).

Thus, in order to admit co-conspirator statements, this Court "must determine that <u>a conspiracy</u> existed, that the co-conspirator and the defendant against whom the statement is offered were members of the conspiracy, and that the statements were made in furtherance of the conspiracy." Pelholtz, 842 F.2d at 356 (emphasis added). The law does not limit the requirement of the existence of a conspiracy to that which is charged in the indictment in order for Rule 801(d)(2)(E) to apply, however. Rather, the mere existence of <u>a conspiracy</u> at the time the statement is made is sufficient.[1]

---

[1] See also United States v. Jiminez Recio, 537 U.S. 270, 274 (2003) (a conspiracy does not automatically terminate simply because the government has defeated its object); United States v. Bagaric, 706 F.2d 42, 65 (2d Cir. 1983) ("There is no requirement that all the Government's evidence fall within the time period of the indictment, providing it is relevant to the charges); United States v. Aleman, 592 F.2d 881, 885 (5th Cir. 1979) (Fed.R.Evid. 404(b) is "simply inapplicable when some offenses committed in a single criminal episode become 'other acts' because the defendant is indicted for less than all of his actions"); United States v. Celaya-Garcia, 583 F.2d 210, 211-12 (5th Cir. 1978) (holding that evidence regarding a heroin transaction involving a defendant and his coconspirators approximately two months after the transaction charged in the indictment was properly admitted without a cautionary instruction, as

Moreover, the law is settled that statements that "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy," are in furtherance of the conspiracy and therefore may be admitted under Rule 801(d)(2)(E). United States v. Tarantino, 846 F.2d 1384, 1412 (D.C. Cir.), cert. denied, 488 U.S. 840 (1988). "Such statements include those that keep a co-conspirator updated "on the status of the business, motivate a co-conspirator's continued participation, or provide background information on key conspiracy members." United States v. Carson, 455 F.3d 336, 367 (D.C. Cir. 2006) (citations and internal quotations omitted). See, e.g., United States v. Edmond, 52 F.3d 1080, 1111 (D.C. Cir. 1995) (Court holding that statements by a cocaine conspirator's mother, who was also a coconspirator, to a government informant, were made in furtherance of the conspiracy, where the mother made references to the defendant as the "big person on the street," to his wife's role in triggering a police investigation into the defendant's activities, and to the defendant's generous salary, as these statements "could plausibly be interpreted as providing important background information to a key player, thereby helping her to carry out her duties") (citation and internal quotations omitted).

---

it demonstrated the continuing plan of the conspiracy), cert. denied, 440 U.S. 926 (1979). Furthermore, this Circuit has held that the government, in a conspiracy prosecution, "is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to explain to the jury how the illegal relationship between the participants in the crime developed.'" United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000) (citation omitted); see United States v. Krout, 66 F.3d 1420, 1425 (5th Cir. 1995) (evidence of an uncharged offense which arose out of the same offenses actually charged is not considered extrinsic evidence); United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994) (evidence of uncharged conduct is not considered "other crimes" evidence if it "arose out of the same . . . series of transactions as the charged offense . . . or if it is necessary to complete the story of the crime on trial") (citation and internal quotations omitted).

**A.    The three telephone calls within the time-frame of the charged conspiracy.**

With respect to the Rayo-Micolta 2005 call, the evidence will show that in this telephone call, Rayo and Micolta discuss in cryptic language the ongoing criminal investigation in Panama involving Rayo, Micolta, and other members of Rayo's drug trafficking organization who had lived in Panama. The evidence will show that from about 1997 into about 2003, Rayo, Micolta, and others lived in Panama, where they oversaw the shipment of cocaine from Colombia to the United States and handled the large amounts of United States currency derived from the sale of that cocaine. By 2003, law enforcement authorities in Panama were investigating Rayo and his organization, causing Rayo to leave Panama and move to Sao Paulo, Brazil.

At page two of the transcript of this call, Rayo and Micolta talk about the "young guy" who was "taking care of the assignment". This assignment involved determining the status of the ongoing Panamanian investigation of Rayo headed by Patricio Candenedo, who is referred to on page two of the transcript as "Patricia". Micolta comments on page two that "they had not removed Patricia from over there", meaning that Candenedo was still in charge of the investigation. (Eventually Candenedo was removed from the investigation.) On page three of the transcript, Rayo comments that "Patricia has not got out", and Micolta responds that "she has the support of those people from up there", meaning the support of authorities in the United States. By page four, the two are again discussing the "young guy" and it is apparent that the "young guy" has some connection to Candenedo's office. At the bottom of page four, Rayo states that "they are not letting Patricia touch many things", referring to the limitations placed on Candenedo in the investigation, and Rayo brings up the possibility of a million dollar bribe. On page five of the transcript, Rayo is asking Micolta to get in touch with the "young guy", "talk directly and clearly to

6

him. Tell him, look what do you want in exchange for this." Micolta responds that he has talked with him already, and that the "young guy" responded that Micolta's friend (Rayo) has not shown any "good will". That is, that Rayo has not come up with any money. At page six Rayo asks Micolta to get in touch with "the guy" and then to contact Rayo when he has done so. At page seven Rayo directs Micolta to tell him (the "guy) that it is "okay ... and if they tell me today, today it is". This call is made during and in furtherance of the conspiracy of which both Rayo and Micolta are members. Rayo is worried about the ongoing Panamanian/DEA investigation of his drug trafficking and it is clear from the conversation that Rayo and Micolta have had previous conversations about the investigation and how Rayo could obstruct the investigation. Moreover, at least one coconspirator witness closely tied to Rayo and Micolta will testify about this call and its meaning.

The telephone calls between Rayo and defendant Gomez occurred on February 7 and 11, 2006. On page one, Rayo tells Gomez that he (Rayo)is having lunch with "Pocho", who is coconspirator Jose Arango. On page one, Rayo gives the phone to Arango, and the transcript reflects conversation between Arango and Gomez from page one to page three of the transcript. Arango begins by telling Gomez that " I was looking for you but you didn't turn up," and continues on page two with Arango telling Gomez that he (Arango)had left a message for Gomez on Gomez' answering machine. Gomez responds by saying " I may be coming over this week" (page two), meaning that Gomez may be coming to Sao Paulo. (On February 16, 2006, the evidence shows that Gomez is spotted in the Sao Paulo airport.) On page three, Arango states that he and Rayo are not in Sao Paulo, but "are in Rio" (de Janiero).

At the bottom of page three, Rayo tells Gomez that he (Rayo) is waiting for Gomez to come, and while waiting, Arango arrived. On page four, Rayo tells Gomez that Rayo has

talked to "Mao", who is Gomez' brother Mauricio Gomez Santos, formerly Rayo's chief lieutenant in charge of moving cocaine out of Colombia for Rayo. At the middle of page four, Rayo refers to Juan Carlos Gomez as "Juanca", and asks him if "the guys are, are participating over there where you are at right now? Are they playing over there?" According to a coconspirator with knowledge of the deal and who will testify at trial, Rayo is referring to a drug trafficking opportunity which Gomez has previously alerted Rayo to, and when Gomez responds in the affirmative, Rayo tells him (page four) "Maybe there are some possibilities for doing something for the time being. But it would be just a little." At the bottom of page four, Gomez tells Rayo that "the guys" are "already leaving to go there" and Rayo responds at the top of page five that he will send Gomez "the papers", meaning the money for the deal. Near the bottom of page five, Rayo refers to an earlier telephone call with Gomez ("what we talked about") and then Rayo tells Gomez that "I'm waiting for you in Sao Paulo so we can talk". Rayo concludes the call by asking Gomez to have his brother Mauricio Gomez call Rayo and then ends by telling Gomez to "call me back. Find out if it is a possibility." In the end, Rayo is referring to the drug deal Gomez is going to set up.

       Four days later, Rayo and Gomez talk again, and Gomez asks Rayo "where am I going" (page one), referring to what hotel in Sao Paulo will Gomez be at. When Gomez responds " I'm going to the same one I was at before", Rayo tells him the hotel is the Melia, which according to the evidence is a hotel located in Sao Paulo. On page two, Gomez tells Rayo "I will tell you everything over there."

       These two conversations are also during and in furtherance of the conspiracy to which both Rayo and Gomez are members. The evidence will show that at the times of these telephone

8

calls, Rayo and Gomez had begun preparing to meet Mexican cocaine traffickers known to Gomez. In the February 7, 2006 call, Rayo determines that Gomez is still in touch with the Mexican traffickers and tells Gomez that he will send the money to make the deal happen. In the February 11, 2006 call, Rayo and defendant Gomez confirm the details of their meeting in Sao Paulo.

In sum, all three of these phone calls occurred within the time period of the charged conspiracy, and in furtherance of the conspiracy. As such, they are admissible under the Fed, R. Evid. 801 (d)(2)(E) exception to the hearsay rule.

**B.    The three telephone calls outside the time-frame of the charged conspiracy.**

In the instant case, the continued existence of a conspiracy involving the coconspirators is clear from the subject matter of each of the three phone calls described above. Moreover, each statement is in furtherance of the conspiracy, because the statement in some way encourages a co-conspirator's continued participation in the conspiracy, provides updated information of others involved in the conspiracy, or provides key information about others involved in the conspiracy, thereby helping another co-conspirator to carry out his own duties in the conspiracy. Tarantino, 846 F.2d at 1412; Carson, 455 F.3d at 367. In the Pablo-Fidel call, for instance, co-conspirators Sandoval and Rayo continue to discuss a plan by which they can conceal drug proceeds. Evidence of money laundering is clearly evidence of a conspiracy to smuggle drugs for profit. Id. at 1412.

In the Rayo-Micolta 2006 call, which is related to the first insofar as Sandoval provided Rayo with defendant Micolta's California telephone number, Micolta attempts to suggests to Rayo an alternate drug route to bring cocaine into the United States from Mexico. On page one of the transcript, Micolta refers to Panama, where he and Rayo previously lived. At the bottom of page one and on pages two and three, Micolta says he is in Los Angeles and they discuss passing something

9

across the border. At the bottom of page three, Micolta again refers to Panama, saying "It is something like there was in Panama, but better because this is good, I mean, good ones". On page five, after Rayo asks how an unidentified person is doing, Micolta responds "they are in Panama". On page nine, Rayo refers to "Jayme", a reference to Jackson Orozco-Gil, who trafficked cocaine with Rayo and Micolta in Panama, and who will be testifying. At the bottom of page 14, Rayo asks Micolta to do Rayo a favor in regards to property Rayo describes as "a lot in Alto, in Panama", and Micolta responds that he had given the deeds to a person known as "La Loca". Their conversation about the property in Panama continues onto page 15 of the transcript. On page 16, Rayo asks Micolta about a "32 that I gave you," referring to a 32 foot boat. In addition, they discuss the reasons for an apparent legal problems of another co-conspirator, Alberto Torres, in Panama, one of the transshipment points that the conspirators used to smuggle cocaine from Colombia to the United States. These topics easily can be interpreted as, first, motivating another co-conspirator to continue to participate in the conspiracy, and, second, warning another co-conspirator that the specific actions. See e.g., Carson, 455 F.3d at 367 (finding that information provided to co-conspirator Smith that potential witnesses against conspirators were shot or attempts were made to shoot them, was in furtherance of the conspiracy, as such information could have served several functions: "to update Smith on eliminated threats; to remind Smith to keep an ear open for more threats; to encourage him to weed out other witnesses against them; and to make sure Smith did not consider turning against the conspiracy[; a]ll of this served to further the conspiracy's goals of selling drugs and evading capture"). Further, although Rayo apparently decided that he was not interested in taking Micolta up on the latter's invitation to attempt a different means of smuggling cocaine into the United States, such a declination is irrelevant to whether the statement was made in furtherance

of the conspiracy. See Tarantino, 846 F.2d at 1412 (that an invitation to participate in a further stage of the conspiracy was declined is irrelevant to whether it was intended to further the conspiracy); Edmond, 52 F.3d at 1111 (for purposes of "Rule 802(d)(2)(E) analysis, the declarant's intent is the relevant inquiry).

In the alternative, this conversation, or least that part which is Micolta's responses, is admissible as an admission against his interest and is not hearsay pursuant to Rule 801. The conversation reveals that Rayo and Micolta are acquainted, that they have a past relationship and an ongoing relationship, and that they were both connected to Panama. Rayo's questions and responses in the conversations are not hearsay, as they are not being admitted for the truth of the matter asserted, but rather to provide context for the responses by Micolta. A defendant's incriminating statements, made after the end of the conspiracy, may still be used against him even if not made during and in furtherance of the conspiracy. See *United States v. Killian,* 524 F.2d 1268, 1272-73 (5th Cir. 1975) and *United States v. Jones,* 839 F.2d 1041, 1051-52 (5th Cir. 1988).

Finally, in the Rayo-Jackson call, which is a follow-up to the Rayo-Micolta 2006 call, Rayo is informing co-conspirator Jackson Orozco-Gil of his conversations with both Sandoval (the Pablo-Fidel call) and defendant Micolta (the Rayo-Micolta 2006 call). In the Rayo-Jackson call, Rayo explains to Orozco-Gil that he is concerned about Sandoval's ability to carry out his duties involving concealing drug proceeds through money laundering, and he also informs Orozco-Gil that he is not interested in pursuing the alternate plan proposed by Micolta. This call thus provides important information to one co-conspirator about another, which may assist the co-conspirator in performing his own duties. For instance, the fact that Sandoval's shortcomings were pointed out to Orozco-Gil

suggests that the latter must be careful in the future about assigning particular tasks to Sandoval; in addition, Orozco-Gil's own responsibilities may be increased in order to fill the gap where Sandoval's performance may be lacking. Thus, all three calls occurring outside the time-frame of the charged conspiracy are admissible under Fed.R.Evid. 801(d)(2)(E).

## Conclusion

WHEREFORE, for the foregoing reasons, the government respectfully requests that it be permitted to introduce the above-referenced evidence at trial.

Respectfully submitted,

/s/
By:  Donnell W. Turner
     Paul Laymon
     Mary E. Mogavero
     Trial Attorneys
     U.S. Department of Justice
     Criminal Division
     Narcotic & Dangerous Drug Section
     950 Pennsylvania Avenue, N.W.,
     Bond Building
     Washington, D.C.  20530
     (202) 514-0917

Dated: June 24, 2008

**CERTIFICATE OF SERVICE**

      I hereby certify that, on this 24th day of June, 2008, a copy of the foregoing Motion in Limine Seeking Admission of Telephone Calls Occurring in Furtherance of the Charged Conspiracy was filed electronically with the Clerk of the Court and served on all counsel of record through the electronic case filing system.

                                            _/s/_____
                                            Mary E. Mogavero
                                            Trial Attorney
                                            Narcotic and Dangerous Drug Section
                                            Criminal Division
                                            U.S. Department of Justice
                                            1400 New York Ave NW
                                            Washington, DC 20530
                                            202-514-0917